# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

WILLIAM T. MATTHEWS,

          Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

          Defendant.

_____/

Case No. 1:16-cv-00536-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.      INTRODUCTION

On April 15, 2016, Plaintiff William T. Matthews ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017).  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

Magistrate Judge.[2]

## II.    BACKGROUND

On July 31, 2012, Plaintiff filed a claim for DIB payments, alleging he became disabled on January 22, 2012, due to back, neck, shoulder, knee, and left wrist problems, as well as stress/anxiety and hypertension.  (Administrative Record ("AR") 19, 23, 84, 97, 150–56, 201, 215.)  Plaintiff was born on May 26, 1964, and was 47 years old on the alleged disability onset date.  (AR 27, 72, 77, 84, 150, 201.)  Plaintiff has an eleventh-grade education.  (AR 216.)  From 2000 to 2001, Plaintiff was a wireline worker.  (AR 205.)  From 2002 to 2004, Plaintiff worked as a tire repairer.  (AR 205.)  From 2006 to 2012, Plaintiff was an oilfield roustabout.  (AR 59–60, 205.)

## A.    Relevant Medical Evidence[3]

On January 22, 2012, Plaintiff suffered an industrial injury at work while moving an 80-pound block.  (AR 384, 395–96.)  Plaintiff was seen at the Industrial Medical Group on January 24, 2012, and was noted to have a lumbar spine strain, cervical spine sprain, and left wrist sprain.  (AR 384, 395–96.)  He was released to regular work without restrictions, but he did not return to work until February 4, 2012.  Plaintiff was provided a lumbar support and a left wrist brace in January 2012, and has been using a cane for ambulatory support since February 2012.  (AR 385.)  On March 6, 2012, Plaintiff was given a diagnosis of stress, anxiety, and hypertension.  (AR 396.)  Over the next two months in 2012, Plaintiff developed low back pain with radiculopathy traveling down both legs to the back of his knee.  (AR 385.)  Plaintiff received electrical stimulation by Nayoung Eoh, D.C.  (AR 384.)

MRIs of Plaintiff's lower back, left wrist, and neck were performed on April 30, 2012.  (AR 292–310, 396–97.)  Plaintiff's lower back MRI showed "facet arthropathy produced bilateral neuroforaminal narrowing" at L4–L5 and "disc protrusion that butted the S1 nerve roots," which "[c]ombined with facet hypertrophy[,] produced bilateral neuroforaminal narrowing."  (AR 292–93, 396–97.)  Plaintiff's left wrist MRI showed "[r]adioscaphoid joint effusion," a "2.5 mm

[2]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7 & 8.)
[3]  As Plaintiff's assertion of error is limited to the ALJ's consideration of his alleged pain symptoms, only evidence relevant to these arguments is set forth below.

negative ulnar variance, a normal variant," and "[n]o other significant findings." (AR 295, 307–08.) Plaintiff's MRI of his neck showed "[d]iffuse idiopathic skeletal hyperostosis"; "disc protrusion that indented the spinal cord[,] producing spinal canal narrowing" at C3–C4, with "bilateral neuroforaminal narrowing" and "[f]acet and uncinate arthropathy"; "disc protrusion that abutted the thecal sac" at C4–C5, with "bilateral neuroforaminal narrowing" and "[f]acet and uncinate arthropathy"; "facet and uncinate arthropathy produced bilateral neuroforaminal narrowing" at C5–C6; "left uncinate arthropathy produced left neuroforaminal narrowing" at C6–C7; and "[s]traightening of the cervical lordosis which may be due to myospasm." (AR 299–300, 303–06, 397.)

In June 2012, Plaintiff received the first of three lumbar epidurals, which lasted "for about a week." (AR 385, 397.) The second epidural "helped for two weeks or so," and the third epidural "did not really give him any relief of his symptoms." (AR 385.)

Treating chiropractor Dr. Eoh placed Plaintiff on total temporary disability from work from approximately February 6, 2012 to September 17, 2012. (AR 314–355.) On August 10, 2012, Dr. Eoh observed "palpable tenderness" to the lumbar and cervical spine, but did not prescribe any physiotherapy, chiropractic care, or acupuncture. (AR 321.) On September 17, 2012, Dr. Eoh noted that Plaintiff's condition was "[i]mproving," and placed him on modified work duty (restricted to lifting 10 pounds, no overhead working, limited use of left hand, and no pushing/pulling) until November 1, 2012. (AR 315–16.)

On September 28, 2012, orthopedic surgeon and consultative examiner Michael G. Klassen, M.D., evaluated Plaintiff. (AR 385.) Dr. Klassen determined Plaintiff was not at maximum medical improvement ("MMI") for his cervical and lumbar spine, and that there was no impairment to Plaintiff's left wrist. (AR 385.) Dr. Klassen recommended 12 to 18 physical therapy sessions. (AR 385.)

On October 16, 2012, an MRI was performed of Plaintiff's shoulder, which showed a partial-thickness tear of the anterior fibers of the distal supraspinatus tendon, acromioclavicular degenerative joint disease, and glenohumeral osteoarthritis. (AR 284.) Plaintiff was diagnosed with sprain/strain of the rotator cuff. (AR 314–15, 321, 327.)

On November 27, 2012, Plaintiff underwent a comprehensive psychological evaluation by clinical psychologist Michael S. Cohn, Ph.D. (AR 373–81.) Plaintiff stated that he "has no psychiatric problems" and specifically denied the presence of depression, anxiety, psychosis, personality disorder, or any other psychiatric illness. (AR 374.) Plaintiff reported that he can take care of self-dressing, self-bathing, and personal hygiene. (AR 375.) Plaintiff is able to pay bills and handle cash appropriately, go out alone, and can focus attention during the interview. (AR 375.) Plaintiff reported that his relationships with family and friends are "good." (AR 375.) Plaintiff stated that he has no difficulty completing household tasks or making decisions. (AR 375.) Plaintiff reported that on a daily basis he eats, cooks, uses a computer, reads, watches television, and sleeps. (AR 375.) Plaintiff's outdoor activity is walking. (AR 375.)

Plaintiff underwent a comprehensive orthopedic evaluation on November 28, 2012, by Fariba Vesali, M.D. (AR 369–72.) Plaintiff complained of "constant, burning and aching" neck pain, and stated that lying down exacerbates the pain while medication relieves it. (AR 369.) Plaintiff described his low back pain as "constant" and "always there," and reported that applying ice to his back decreases the pain. (AR 369.) Plaintiff stated that he did not do grocery shopping or any chores at home. (AR 369.)

Dr. Vesali observed that Plaintiff was "not in acute distress," and did not have any difficulty getting off and on the examination table, taking off and on his shoes, and picking up a paperclip from the examination table. (AR 370.) Plaintiff walked with a normal gait, even without a cane. (AR 370.) Dr. Vesali noted tenderness on Plaintiff's left shoulder, left foot, cervical and upper thoracic spine, and lumbar spine, as well as a positive Patrick's test on the left side. (AR 371.) Plaintiff had normal muscle bulk and tone and motor strength in the bilateral upper and lower extremities, full grip strength, and decreased sensation in the entire left lower extremity. (AR 371–72.) Plaintiff declined other testing. (AR 370–71.) Dr. Vesali opined that Plaintiff should be able to walk, stand and sit for six hours in an eight-hour day with normal breaks; lift and carry 50 pounds occasionally and 25 pounds frequently; and perform frequent postural activities and manipulative activities with his left hand. (AR 372.) Plaintiff did not need an assistive device for ambulation and had no right-hand manipulative or workplace

environmental limitations. (AR 372.) Dr. Vesali diagnosed Plaintiff with chronic low back pain, possible left shoulder impingement syndrome, and chronic neck pain. (AR 371–72.)

Plaintiff reported receiving a cervical spine epidural in February 2013, which "helped him for about a week." (AR 385.) On March 1, 2013, Plaintiff underwent another qualified medical evaluation and examination by Dr. Klassen. (AR 383–403.) Plaintiff reported that many of his activities of daily living were performed with much difficulty or pain, and that he was unable to take a bath and perform light house work. (AR 386–87.) Dr. Klassen observed cervical muscle spasms, cervical traction and compression pain, and tenderness in Plaintiff's cervical spine, suprascapular/trapezius, and paraspinal muscles. (AR 388–89.) Plaintiff had limited range of cervical motion, no atrophy, normal muscle strength and sensation. (AR 388–89.)

Dr. Klassen noted that Plaintiff was unable to perform heel/toe walking, and that he had tenderness to palpation from mid-back to L5 and limited range of lumbar motion. (AR 390.) Plaintiff's lumbar sensory tests were all normal, and Plaintiff's right straight leg test was normal, while his left leg straight leg test was "[e]quivocal." (AR 391.) Dr. Klassen observed that Plaintiff moved extremely slowly in a guarded or protective fashion, sat with a rigid posture, and demonstrated facial grimacing. (AR 391.) Dr. Klassen diagnosed Plaintiff with cervicalgia and lumbago, but determined that Plaintiff had not reached the maximum medical improvement from treatment to his cervical and lumbar spine. (AR 391, 406.) Dr. Klassen recommended physical therapy and medication management, and noted that Plaintiff may also be a candidate for additional epidurals if he developed radiculopathy. (AR 395.) He restricted Plaintiff to lifting 5 pounds occasionally; standing to alternate standing/sitting 15 minutes at a time; no repetitive cervical spine motion up and down or side to side; and no repetitive bending, stooping, squatting or twisting of the lumbar spine. (AR 394.)

According Dr. Klassen's summary of Plaintiff's medical records, on April 17, April 24, and June 4, 2013, Plaintiff received acupuncture treatments for pain in his cervical spine, lumbar spine, and left wrist. (AR 417.) Plaintiff attended "therapy sessions" consisting of "electrical stimulation, infrared, manual traction and myofacial release/soft tissue mobilization" for cervical and lumbar spine pain on May 1, 7, 13, 22, and 29, 2013; and June 3, 5, and 10, 2013. (AR 417.)

As Dr. Klassen noted, on May 8, 2013, Plaintiff was seen by Edward Opoku, D.O. (AR 417.) Plaintiff complained of "sharp" and "constant" cervical spine pain rated 10/10 that was worse with activities of daily living; "sharp" lumbar spine pain rated 10/10 that radiated to the front pelvic region; and "occasional" left shoulder pain. Dr. Opoku diagnosed Plaintiff with a cervical spine disc bulge with radiculopathy; a thoracic spine sprain/strain; a lumbar spine disc bulge with radiculopathy; and left shoulder supraspinatus "tear per MRI." (AR 417.) Dr. Opoku referred Plaintiff for extracorporeal shockwave therapy ("ESWT") for his cervical and lumbar spine, and to pain management and orthopedics for pain in Plaintiff's cervical spine, lumbar spine, and left shoulder. (AR 417.) Dr. Opoku also dispensed a lumbar brace, capsaicin, Flurbiprofen, methyl salicylate ointment, Flurbiprofen/Tramidol cream, and a Medrox patch. (AR 417.) As a result of his exam, Plaintiff was found to be unable to return to work. (AR 417.)

Plaintiff presented to John Korzelius, M.D. on June 12, 2013, with complaints of "[p]ersistent pain in the lumbar spine rated 8/10." (AR 417.) As noted by Dr. Klassen, Dr. Korzelius diagnosed Plaintiff with a partial tear of the rotator cuff; degenerative cervical intervertebral disc; and degenerative lumbar/lumbosacral intervertebral disc. (AR 417.) Dr. Korzelius referred Plaintiff for ESWT for his lumbar spine, and recommended that Plaintiff continue use of a lumbar spine brace. (AR 417.) Dr. Korzelius also dispensed capsaicin, Flurbiprofen, methyl salicylate ointment, Flurbiprofen/Tramidol cream, and a Medrox patch. (AR 417.) Plaintiff was put on temporary total disability ("TTD") for 45 days. (AR 417.)

As Dr. Klassen summarized in his treatment notes, on July 24, 2013, Dr. Opoku noted Plaintiff's condition remained "unchanged" and was permanent and stationary ("P&S") "with objective factors of permanent disability." (AR 417.) Dr. Opoku limited Plaintiff's walking and standing to 60 minutes consecutively, limited his lifting to no more than 25 pounds, and discontinued physical therapy/chiropractic care and acupuncture. (AR 417.)

On September 11, 2013, Plaintiff again presented to Dr. Opoku with complaints of "sharp" and "constant" cervical spine pain rated 10/10 that was worse with standing; and "sharp" and "intermittent" lumbar spine pain rated 8/10 that was worse with activity. (AR 417–18.) As Dr. Klassen summarized, Dr. Opoku diagnosed Plaintiff with cervical spine radiculopathy;

degenerative cervical intervertebral disc; and degenerative lumbar/lumbosacral intervertebral disc. (AR 418.) As a result of that exam, Dr. Opoku prescribed Ultracet, Tylenol, and Flexeril to Plaintiff. (AR 418.)

On November 22, 2013, Plaintiff was again evaluated by Dr. Klassen. (AR 405–22.) Plaintiff reported that he was unable to make a meal, type a message on the computer, run errands, perform light house work, sleep, and engage in sexual activity. (AR 407.) At the time of the examination, Plaintiff was prescribed Hydrochlorothiazide, Metoprolol, Amlodipine, Doxazion, and Norco. (AR 408.) Plaintiff's physical exam results were the same as those from Plaintiff's March 1, 2013, examination, except that Dr. Klassen opined that Plaintiff did not have cervical spine radiculopathy or significant lumbar radiculopathy. (AR 410–15.) Dr. Klassen noted that Plaintiff "has not had the care as described in my previous reports." (AR 416.)

As a result of the November 22, 2013 evaluation, Dr. Klassen limited Plaintiff to lifting 25 pounds occasionally and 5 pounds frequently; walking, standing, and sitting to 60 minutes at one time; no repetitive extension, flexion, or rotation, of the cervical spine; and no activity working above eye gaze in a neutral position. (AR 416.)

**B.      Plaintiff's Statement**

On October 2, 2012, Plaintiff completed an adult function report. (AR 247–55.) Plaintiff stated that he cannot do regular tasks, he cannot bend, he cannot squat, and he is constant pain. (AR 247.) Plaintiff stated that medication keeps him drowsy. (AR 247.) When asked to describe what he did from the time he wakes up to the time he goes to bed, Plaintiff reported that he awakes with pain, takes medication, showers with his wife's assistance, eats meals his wife cooks, drives to the doctor to do therapy, takes more medication upon returning home, and then goes to sleep. (AR 248.)

Plaintiff reported that he needs help getting dressed because he can't bend and is out of energy, that he can't bathe, that his wife helps him shave, and that he feeds himself "with pain[,] sometimes lying down." (AR 248.) Plaintiff cannot prepare meals because he "can't stand long" and is "in constant pain," and cannot perform household chores because of "constant pain" in his back, neck, and legs. (AR 249–50.) Plaintiff reported that he goes outside every day, drives a

car, and goes grocery shopping once a week or every two weeks. (AR 250.) Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook. (AR 250.) Plaintiff's interests and hobbies are reading, watching television, and going to church when he's not "too tired." (AR 251.) Plaintiff reported spending time with others at church once a week or every two weeks. (AR 252.) He can walk a half a block with his cane, and uses his cane and a back brace "all the time." (252–53.) Plaintiff takes hydrocodone and experiences drowsiness and dizziness as a result. (AR 254.) Plaintiff states that he cannot lift, squat, bend, reach, kneel, climb stairs, or stand long without experiencing pain in his back, neck and/or leg. (AR 254.) Plaintiff can only walk short distances with a cane before stopping and cannot sit long due to pain in his back and legs. (AR 254.) Plaintiff reports that he has trouble completing tasks without reminders from his wife, that he can't concentrate for long, and that he has to be reminded to follow instructions. (AR 254.) Plaintiff states that he is angry and depressed because he can no longer do the things he could do normally. (AR 254.)

Plaintiff completed a disability report in which he indicated that someone has to assist him putting on his shoes and socks because he cannot bend over. (AR 269.) Plaintiff stated in the disability report that he mostly stays home and rests because "the pain really limits what [he] can do." (AR 269.)

## C.    Administrative Proceedings

Plaintiff filed an application for DIB payments on July 31, 2012, alleging he became disabled on January 22, 2012. (AR 19, 23, 84, 97, 150–56, 201, 215.) The agency denied Plaintiff's applications for benefits initially on December 27, 2012, and again on reconsideration on June 25, 2013. (AR 72–100.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 108–09.) On April 4, 2014, Plaintiff appeared with counsel and testified before an ALJ. (AR 44–70.)

### 1.    Plaintiff's Testimony

Plaintiff testified his back pain is "constant" and gets worse when he moves and with colder temperature. (AR 48.) Plaintiff described "constant" pain radiating down his legs to his calves, and pain in his neck, shoulders, and head. (AR 55.) Plaintiff testified that he has pain

8

"from the back of [his] head, all the way down and across [his] shoulders. (AR 56.) Plaintiff testified that he doesn't have a problem with his shoulders and has no problem raising or using his arms. (AR 60.) Plaintiff stated that he gets migraine headaches as a result of his neck pain about once or twice a week and that the headaches last four to five hours on average. (AR 56.) Plaintiff has to lie down when experiencing a migraine headache. (AR 56–57.) Plaintiff's pain inhibits his ability to focus and concentrate. (AR 59.)

Plaintiff appeared at the hearing using a cane prescribed by Dr. Eoh, and testified that he had used the cane for 18 months "most of the time" because "it's hard to walk and I'll be hurting all the time." (AR 47.) Plaintiff testified that he has used a back brace for two years. (AR 48.) Plaintiff stated that his pain level with medication was between eight and nine out of ten. (AR 52.) Plaintiff testified that he takes Norco, which helps, but the side effects cause him to sleep all day. (AR 51.) Plaintiff stated that the medications cause dizziness, sleepiness, and make him groggy "all the time." (AR 53.) Plaintiff testified that over the course of a year he had about ten epidural shots in his low back, mid-back, and neck, and that the shots last "for about a week" before the pain returns. (AR 55–56, 57.) Plaintiff stated that his worker's compensation physician told him "he didn't think he would recommend surgery." (AR 58.) Plaintiff's treating physician at the time of the hearing was Dr. Gordon, whom Plaintiff sees for his blood pressure and pain complaints. (AR 62.)

Plaintiff testified he lives with his wife and 16-year-old daughter. (AR 47.) When asked what he does in a typical day, he testified his wife leaves him breakfast before she goes to work or he makes cereal on his own. Plaintiff's day "is usually laying [sic] around, laying down, sit[ting] on the couch, looking at TV, getting back up, laying on the bed; just around the house a lot." (AR 49.) Plaintiff testified he has 20 "bad days" a month (4 "bad days" a week), when he spends time moving from the couch to the bed. (AR 58.) On the days that Plaintiff feels better, he testified that he's "just able to get up and move around better," and that he's "still hurting . . . but it's just not as bad." (AR 58.)

Plaintiff testified that he drives his daughter to school about two miles round-trip about every other day. (AR 49.) He does not perform household chores. (AR 49.) Plaintiff stated that

he does no lifting due to pain. (AR 60.) He testified he can walk for 20 minutes before sitting down. (AR 49–50.) Plaintiff reads the Bible on his computer while sitting, but testified that he will stand periodically and not assume one "specific position." (AR 50–51.) Plaintiff testified that he reads the Bible three times a week and also listens to it on his phone. (AR 59.) Plaintiff testified that he is a Baptist minister and, in that capacity, teaches Sunday school every Sunday and preaches "some Sundays." (AR 53.) While preaching, he stands up for 15 or 20 minutes before needing to sit down. (AR 54.) Plaintiff testified that he had to miss the last few Sundays due to pain. (AR 54.)

### 2. Vocational Expert's Testimony

The Vocational Expert ("VE") identified Plaintiff's past work as a roustabout, Dictionary of Operational Titles (DOT) code 869.684-046, which was heavy exertional skilled work with a specific vocational preparation (SVP)[4] of 5; as a tire repairer, DOT code 915.684-010, which was at a medium exertion level and semiskilled with a SVP of 3; and as a wireline worker, DOT code 931.361.010, which was at a medium exertion level and skilled with a SVP of 5. (AR 63–64.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his past job experience. The VE was also to assume this person is limited to standing and/or walking, with a cane for walking as needed, up to 60 minutes at a time for a total of 6 out of 8 hours; can lift up to 10 pounds frequently and 20 pounds occasionally; can carry 5 pounds frequently and 10 pounds occasionally; can stoop, kneel, crouch, crawl, and balance on an occasional basis; and can reach overhead with the bilateral upper extremities occasionally. (AR 657–58.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work as an assembler, DOT code 712.687-010, light exertion level and SVP 2; packing line worker, DOT code 237.367-018, light exertion level and SVP 2; and sorter, DOT code 529.687-186, light exertion level and SVP 2. (AR 64.)

The VE was also asked to consider a person of Plaintiff's age, education, and work

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id*.

background but could lift 25 pounds frequently and 50 pounds occasionally; stand, sit, and/or walk with normal breaks for 6 out of 8 hours; use ramps, stairs, frequently; use ladders, ropes, and scaffolding occasionally; frequently balance, stoop, kneel, crouch, and crawl; lift with the left upper extremity occasionally; and with no limitations on pushing and pulling, including operation of hand and/or foot controls. (AR 65.) The VE testified that such a person could perform Plaintiff's past relevant work of wireline worker. (AR 65.)

The ALJ asked a follow up question regarding the first hypothetical worker who also was limited to lifting 25 pounds occasionally and 5 pounds frequently; to walking, standing, and sitting to 60 minutes at one time; could perform no repetitive extension, flexion, or rotation, of the cervical spine; and could perform no activity working above eye gaze in a neutral position. (AR 65, 416.) The VE testified that if such a person required a break of undetermined time there would be no jobs available, but if there was a sit/stand option available, then the assembler and sorter jobs would be available (reduced by 90 percent), as well as order clerk, DOT code 209.567-014, sedentary exertion level and unskilled at SVP 2. (AR 65–67.) Plaintiff's counsel inquired whether there would be any jobs available if the first hypothetical worker would need, in addition to the normal breaks the law is required to provide, at least another hour to lie down. (AR 69.) The VE responded that there would be no jobs available under that scenario. (AR 69.)

**D.      The ALJ's Decision**

In a decision dated June 25, 2014, the ALJ found that Plaintiff was not disabled. (AR 16–29.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 21–29.) The ALJ decided that Plaintiff has not engaged in substantial gainful activity since January 22, 2012, the alleged onset date (step 1). (AR 21.) The ALJ found that Plaintiff had the severe impairments of (1) degenerative disc disease of the lumbar and cervical spine, (2) degenerative joint disease of the left shoulder, and (3) obesity (step 2). (AR 21.) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step 3). (AR 22–23.) The ALJ determined that Plaintiff had the residual functional

capacity ("RFC")[5]

> to perform light work as defined in 20 CFR §§ 404.1567(b) except he can sit with normal breaks up to 6 hours in an 8-hour day; stand and/or walk up to 60 minutes at a time for a total of 6 hours in an 8-hour day, walking with a cane as needed for ambulation; lift up to 10 pounds frequently and 20 pounds occasionally; carry 5 pounds frequently and 10 pounds occasionally; and occasionally stoop, kneel, crouch, crawl, balance, and reach overhead with the bilateral upper extremities.

(AR 23.)

The ALJ determined that, given his RFC, Plaintiff was unable to perform any past relevant work (step 4), but that Plaintiff was not disabled because he could perform a significant number of other jobs in the local and national economies, specifically assembler, packing line worker, and sorter (step 5). (AR 28.) In reaching her conclusions, the ALJ also determined that Plaintiff's subjective complaints were not entirely credible. (AR 26.)

### III.   SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

"must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.     APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities.   *Id*. §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work.   *Id*. §§ 404.1520(f), 416.920(f).   If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform

other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.    DISCUSSION

Plaintiff contends that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's testimony regarding his subjective complaints. (Doc. 13.) The Commissioner responds that the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations. (Doc. 14.)

**A.     The ALJ's Consideration of Plaintiff's Testimony**

**1.     Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id*. The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id*. As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation

marks omitted); *see also Bray*, 554 F.3d at 1226–27; 20 C.F.R. § 404.1529.  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

### 2.    The ALJ Properly Found Plaintiff Less Than Fully Credible

Here, the ALJ found Plaintiff's credibility was undermined by Plaintiff's treatment history, poor work history, the objective medical evidence, and the functional abilities Plaintiff demonstrated in daily activities that were in excess of his allegations of disability.  (AR 26–27.)

### a.    Treatment History

In rejecting Plaintiff's subjective complaints based on his treatment history, the ALJ found:

> [Plaintiff's] treatment is not what I would expect with someone with severe back pain.  For example, there is insufficient objective evidence of medical treatment since October 16, 2012.  Additionally, his treatment since the alleged onset date was conservative and did not include surgery.  Overall, [Plaintiff's] medical treatment was conservative and not indicative of total disability.  (Ex. 5F.)

(AR 27.)  The Court takes each finding in turn.

### i.    *Lack of Treatment Evidence Since October 16, 2012*

Defendant argues that the ALJ's reliance on the lack of treatment records after October 16, 2012, is not erroneous because "[t]he ALJ is permitted to consider lack of treatment in h[er] credibility determination," citing *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  (Doc. 14 at 6–7.)  The ALJ's finding of "insufficient" treatment records after October 16, 2012,

however, is not supported by the record.

As the ALJ noted, qualified medical examiner Dr. Klassen "summarized some medical records" in his November 22, 2013 opinion, to which the ALJ assigned "great weight." (AR 26.) These medical records demonstrate that Plaintiff received numerous treatments, and was seen by treating physician Dr. Opoku, after October 16, 2012. Specifically, the records show that on April 17, April 24, and June 4, 2013, Plaintiff received acupuncture treatments for pain in his cervical spine, lumbar spine, and left wrist, and he attended "therapy sessions"[6] for cervical and lumbar spine pain on May 1, 7, 13, 22, and 29, 2013; and June 3, 5, and 10, 2013. (AR 417.) The records also show that Plaintiff was seen by treating physicians Dr. Korzelius and Dr. Opoku, whose medical source statement the ALJ gave "great weight" (AR 26), on May 8, June 12, July 24, and September 11, 2013, and Plaintiff was prescribed a lumbar brace, capsaicin, Flurbiprofen, methyl salicylate ointment, Flurbiprofen/Tramidol cream, a Medrox patch, Ultracet, Tylenol, and Flexeril by those treaters. (AR 417–18.)

It appears that these medical records were largely ignored by the ALJ. Although the ALJ is not required to "discuss every piece of evidence," the record does need to demonstrate that she considered all of the evidence. *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). Here, the record does not. The ALJ's failure to mention—much less consider—these treating records, and instead predicate her adverse credibility finding in part on their absence, is error.[7] *See Regennitter v. Commissioner*, 166 F.3d 1294, 1297 (9th Cir. 1999)

---

[6] The sessions consisted of "electrical stimulation, infrared, manual traction and myofacial release/soft tissue mobilization." (AR 417.)

[7] The ALJ also criticizes the record's lack of records from Dr. Gordon, whom Plaintiff testified was his current treatment provider. (AR 27, 62.) At the hearing, Plaintiff's counsel stated that he had requested records from Dr. Gordon, but that Dr. Gordon had not yet responded. (AR 62.) Plaintiff's counsel did not request a continuance so the records could be obtained. (AR 69 (At the end of the hearing, counsel stated, "That's all I would have," to which the ALJ responded, "All right. If there's nothing further, we can close the hearing. Thank you.").) The ALJ made post-hearing requests for records from Dr. Gordon on April 21 and May 5, 2014, but no such records were submitted. (AR 27, 277.) To date, Plaintiff has not put forth any records from Dr. Gordon. It is Plaintiff's duty to proffer medical evidence proving he is disabled. *See Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); ); 42 U.S.C. § 423(d)(5)(A) (claimant must furnish medical and other evidence of his disability); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have impairment(s) and how severe it is during the time you say you are disabled."). The ALJ therefore did not err in considering the lack of treatment evidence from Dr. Gordon. *Cf. Hamilton v. Astrue*, No. CV 11–7851–JSL €, 2012 WL 3217850, at *5 (C.D. Cal. Aug. 7, 2012) (finding the ALJ erred in failing to develop the record more fully where the ALJ did *not* attempt to contact the treating physicians for documentation).

(The ALJ's inaccurate characterization of the evidence of record rendered the ALJ's credibility determination invalid).

However, because the ALJ articulated permissible reasons for discounting Plaintiff's credibility, specifically Plaintiff's conservative treatment history, Plaintiff's poor work history, and evidence in the record that conflicted with Plaintiff's allegation of total disability, as set forth below, this error is harmless. *See Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F. 3d 1190, 1197 (9th Cir. 2004) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal."); *Tonapetyan v. Halter,* 242 F. 3d 1144, 1148 (9th Cir. 2001) (That some reasons for discrediting claimant's testimony should be properly discounted does not render an ALJ's determination invalid so long as that determination is supported by other, substantial evidence).

*ii.     Conservative Treatment*

The ALJ's credibility assessment properly relied on evidence that Plaintiff's treatment was "conservative" and therefore "not indicative of total disability." (AR 27.) The ALJ observed that Plaintiff was provided a lumbar support brace and a left wrist brace in January 2012, and used a cane prescribed by treating chiropractor Dr. Eoh for ambulatory support since February 2012. (AR 24, 47–48, 385.) The ALJ noted Plaintiff underwent electrical stimulation treatment by Dr. Eoh. (AR 24, 384.) On August 10, 2012, Plaintiff presented to Dr. Eoh, who, despite observing a "palpable tenderness" to Plaintiff's lumbar and cervical spine, did not prescribe any physiotherapy, chiropractic care, or acupuncture. (AR 25, 321.) As the ALJ noted, Dr. Eoh found that Plaintiff's condition was "[i]mproving," and placed him on modified work duty (restricted to lifting 10 pounds, no overhead working, limited use of left hand, and no pushing/pulling) from September 17, 2012 to November 1, 2012. (AR 25, 315–16.)

The ALJ further observed that orthopedic surgeon and examiner Dr. Klassen determined on September 28, 2012, Plaintiff was not at maximum medical improvement ("MMI") for his cervical and lumbar spine, and that there was no impairment to Plaintiff's left wrist. (AR 24,

385.)  Dr. Klassen recommended 12 to 18 physical therapy sessions.  (AR 24, 385.)  On March 1, 2013, Dr. Klassen recommended more physical therapy and medication management.  (AR 25, 395.)  Plaintiff testified that that his worker's compensation physician told him "he didn't think he would recommend surgery" (AR 58), and there is no indication in the record that any physician recommended that Plaintiff have surgery.  Based on the above conservative treatment, the ALJ was entitled to discount Plaintiff's credibility.  *See Tommasetti,* 533 F.3d at 1040 (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset"); *Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment); *Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ may properly rely on the fact that only conservative treatment has been prescribed).

The record shows that Plaintiff was prescribed Norco, which relieved the pain[8], and received about ten epidural steroid injections in his lumbar and cervical spine.  (AR 24, 51, 55, 254, 408.)  The ALJ further noted that Plaintiff was also prescribed ibuprofen.  (AR 24.)  Plaintiff contends that his receipt of prescription pain medication and epidural injections demonstrates that he did not undergo "conservative" treatment for his pain.  (Doc. 13 at 12–13.)  While Plaintiff is correct that epidural injections, by themselves, have been found not to constitute conservative treatment, *see Yang v. Colvin*, No. CV 14–2138–PLA, 2015 WL 248056, at *6 (C.D. Cal. Jan. 20, 2015), courts have frequently found that the fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in addition to other, less invasive treatment methods.  *See Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment" was sufficient for the ALJ to discount the plaintiff's testimony

---

[8] Impairments that can be controlled effectively with medication are not considered disabling.  *Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006).

regarding the severity of impairment.); *Morris v. Colvin,* No. 13–6236, 2014 WL 2547599, at \*4 (C.D. Cal. June 3, 2014) (ALJ properly discounted credibility when plaintiff received conservative treatment consisting of physical therapy, use of TENS unit, chiropractic treatment, Vicodin, and Tylenol with Vicodin); *Jones v. Comm'r of Soc. Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at \*7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility); *Higinio v. Colvin*, No. EDCV 12–1820 AJW, 2014 WL 47935, at \*5 (C.D. Cal. Jan. 7, 2014) (holding that despite the fact that the claimant had been prescribed narcotic pain medication at various times, the claimant's overall treatment—which also included use of a back brace and a heating pad—was conservative); *Walter v. Astrue*, No. EDCV 09–1569 AGR, 2011 WL 1326529, at \*3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection). Accordingly, the ALJ's adverse credibility determination based on Plaintiff's conservative treatment will not be disturbed.

### b. Work History

The ALJ found Plaintiff not entirely credible in part because his "work history does not indicate that he would be working if he could." (AR 27.) Plaintiff argues that because the ALJ never questioned him at the hearing about the size of his earnings, any negative inference is "pure speculation" and not substantial evidence. (Doc. 13 at 13.)

An ALJ is required to consider work history when assessing credibility. *See* 20 C.F.R. § 404.1529(c)(3)(An ALJ "will consider all of the evidence presented, including information about your work record"); Social Security Ruling ("SSR")[9] 95-7p (An ALJ's assessment of credibility must be based on all of the evidence on record, including prior work record). Evidence of a poor work history is a clear and convincing reason to discredit plaintiff's

---

[9] Social Security Rulings ("SSR") are final opinions and statements of policy by the Commissioner of Social Security, binding on all components of the Social Security Administration. 20 C.F.R. § 422.406(b)(1). They are "to be relied upon as precedent in determining cases where the facts are basically the same." *Paulson v. Bowen*, 836 F.2d 1249, 1252 n.2 (9th Cir. 1988).

credibility. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (upholding ALJ's negative credibility determination because, among other factors, plaintiff's "work history was spotty, at best" and she "has shown little propensity to work in her lifetime"); *Moore v. Astrue,* No. CV–08–1567–RC, 2009 WL 1330856, at *6 (C.D. Cal. May 13, 2009) (finding the ALJ correctly relied on claimant's poor work history to support an adverse credibility determination).

Here, although Plaintiff earned over $50,000 in each year from 2007 through 2011, he earned less than $10,000 from 2002 to 2006, and in 1998 (with no earnings in 2005), and earned less than $20,000 in the years 1997, 1999, and 2001. (AR 168.) For the year 2000, Plaintiff earned less than $30,000. (AR 168.) The Court finds that Plaintiff's earning records constitute substantial evidence sufficient to support the ALJ's finding of poor work history prior to the alleged date of onset, which is a valid reason to discount Plaintiff's credibility. *Thomas*, 278 F.3d at 959; *Moore,* 2009 WL 1330856, at *6. While it is true that factor(s) other than a lack of propensity to work could account for Plaintiff's low earnings from 1997 to 2007, this Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff. *See Tommasetti*, 533 F.3d at 1039. Remand is therefore not warranted on this basis.

### c.    Objective Medical Evidence

The ALJ properly discounted Plaintiff's credibility due to inconsistencies between Plaintiff's subjective complaints and the medical evidence, specifically that Plaintiff's complaint of radiculopathy was not verified by diagnostic testing or clinical signs. (AR 27.) *See Regennitter*, 166 F.3d at 1297 (explaining that a determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement). In his adult function report and his testimony at the hearing, Plaintiff claimed "constant" pain radiating down his legs to his calves, and pain in his neck, shoulders, and head. (AR 55, 249–50.) Plaintiff claimed that he cannot lift, squat, bend, reach, kneel, climb stairs, or stand long without experiencing pain in his back, neck and/or leg, and can only walk short distances with a cane before stopping. (AR 49–50, 60, 254.) However, Dr. Klassen, consultative examiner, made contradictory findings. On November 22, 2013, Dr. Klassen noted that Plaintiff's

complaint of lumbar radiculopathy was "not verified at this time on electrodiagnostic testing," and explicitly found that Plaintiff *did not* have cervical spine radiculopathy or significant lumbar radiculopathy." (AR 414–15 (emphasis added); *see also* AR 395 (opining that *if* Plaintiff developed radiculopathy, he may be a candidate for additional epidurals) (emphasis added).) Dr. Klassen opined that Plaintiff could lift 25 pounds occasionally and 5 pounds frequently and walk, stand, and sit for 60 minutes at one time. (AR 416.) Consultative examiner Dr. Vesali found that Plaintiff had normal muscle bulk and tone and motor strength in the bilateral upper and lower extremities and full grip strength. (AR 371–72.) Finally, in contrast to Plaintiff's claims, treating chiropractor Dr. Eoh noted that Plaintiff's condition was "[i]mproving," and released him to perform modified work (restricted to lifting 10 pounds, no overhead working, limited use of left hand, and no pushing/pulling) effective November 1, 2012. (AR 315–16.) As the ALJ noted in his decision, Plaintiff's "stated limitations are in excess of the objective medical findings and other evidence in the record."[10] (AR 27.)

While Plaintiff is correct that subjective symptom testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence (*see* Doc. 13 at 11–12), the medical evidence is still a relevant factor in determining Plaintiff's credibility. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 CFR § 404.1529(c)(2)). Here, Plaintiff's subjective complaints were not rejected *solely* on the ground that they were inconsistent with the objective medical evidence: the ALJ also relied on evidence of Plaintiff's conservative treatment and work history as independent reasons to discredit Plaintiff. The inconsistencies between Plaintiff's complaints of severe pain and clinical observations, taken together with evidence of Plaintiff's receipt of only conservative treatment and his poor work history, constitute substantial evidence supporting the ALJ's adverse credibility finding. *See Smith v. Colvin*, No. 2:1–cv–03045–KJN, 2013 WL 1156497, at *8 (E.D. Cal. Mar. 19, 2013) (An ALJ may properly rely on plaintiff's conservative treatment, poor work history, and on conflict between claimant's testimony of subjective complaints and objective medical evidence in the record). *See also Velasquez v. Colvin*, No. ED CV 13–1542–AS, 2014 WL 6473790, at

---

[10] Plaintiff does not challenge the credibility of these—or any—physicians' opinions.

*7 (C.D. Cal. Nov. 19, 2014); *Chopp v. Colvin*, No. ED CV 12–291–SP, 2013 WL 1120085, at *3–5 (C.D. Cal. Mar. 18, 2013).

### d.  Activities of Daily Living

The ALJ's final reason for discounting Plaintiff's subjective symptom testimony was that Plaintiff's activities of daily living were inconsistent with his allegation that he was totally disabled.  (AR 27.)  As set forth above, an ALJ is allowed to consider a claimant's daily activities in assessing a claimant's credibility.  *Tommasetti*, 533 F.3d at 1041.  However, "[t]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability.  One does not need to be 'utterly incapacitated' in order to be disabled."  *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)).

Here, the ALJ found that Plaintiff's allegations of debilitating pain (*see, e.g.,* AR 23–24) were inconsistent with his statements and testimony that he drives, goes outside on a daily basis, shops for groceries, manages his money, reads the Bible on his computer, gives sermons at church, and teaches Sunday school.  (AR 27.  *See also* AR 50–51, 53, 250.)  This level of activity is not inconsistent with Plaintiff's claimed limitations, particularly given his testimony that he can only preach standing for 15 or 20 minutes before needing to sit (AR 54), that he reads *or listens to* the Bible three times a week (AR 59), that he spends most of the day lying down (AR 49, 58), and that he spends most of his day at home (AR 49, 58).  *See Garrison*, 759 F.3d at 1016 (only if the claimant's level of activity were inconsistent with his claimed limitations would those activities have any bearing on his credibility); *see also id.* (the claimant's ability to talk on the phone, prepare meals once or twice a day, occasionally clean one's room, and, with assistance, care for one's child, all the while taking hours-long rests is consistent with an inability to function in a workplace environment).  Nevertheless, to the extent that the ALJ may have erred in discrediting Plaintiff's subjective symptom testimony partly on the basis of his daily activities, the error is harmless, because the ALJ cited other clear and convincing reasons for her credibility determination, *infra*.  *See Carmickle*, 533 F.3d at 1162–

63. Thus, the ALJ did not err in finding Plaintiff's subjective symptom testimony and statements "not entirely credible."

## VI.     CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **August 4, 2017**                    /s/ *Sheila K. Oberto*
                                          UNITED STATES MAGISTRATE JUDGE